UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

ROBYN DITOCCO and TONY DITOCCO,　　　:

　　　　　　　　　　　　　　　　　　　　:　　10 Civ. 4186 (SHS)

　　　　　　　　　　　　Plaintiffs,　　　:

　　　　　　　　　　　　　　　　　　　　:　　OPINION & ORDER

　　　　　　-against-　　　　　　　　　:

　　　　　　　　　　　　　　　　　　　　:

RICK RIORDAN, DISNEY/ABC　　　　　　:

INTERNATIONAL TELEVISION　　　　　　:

COMPANY, INC., THE WALT DISNEY　　　:

COMPANY, TWENTIETH CENTURY FOX　　:

FILM CORPORATION, FOX　　　　　　　:

ENTERTAINMENT GROUP, INC., DUNE　　:

ENTERTAINMENT III LLC, and DOES 1-10　:

　　　　　　　　　　　　　　　　　　　　:

　　　　　　　　　　　　Defendants.　　:

-------------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

　　　　This copyright action arises out of the *Percy Jackson & The Olympians* series of young-adult fantasy stories.  Plaintiffs Robyn and Tony DiTocco allege that the five *Percy Jackson* novels by Rick Riordan and the derivative *Percy Jackson* motion picture infringe upon their copyrights in two books they wrote, *The Hero Perseus* and *Atlas' Revenge*.  Defendants have all moved to dismiss the complaint on the ground that, as a matter of law, their works are not substantially similar to plaintiffs'.  Because no reasonable jury could find that any of defendants' works are substantially similar to plaintiffs' works as a matter of law, defendants' motions are granted.

**I.　　BACKGROUND**

　　　　A.　Parties

　　　　Plaintiffs Robyn and Tony DiTocco, a married couple, are the authors of *The Hero Perseus: A Mad Myth Mystery* (2002), and *Atlas' Revenge: Another Mad Myth Mystery* (2004).

1

(Compl. ¶¶ 1, 19.)  They own registered copyrights for both books.  (*Id. ¶¶* 19, 24; Exs. A, B to Compl.)

Defendant Rick Riordan is the author of a five-book series, *Percy Jackson & The Olympians*, which consists of *The Lightning Thief* (2005), *The Titan's Curse* (2006), *The Sea of Monsters* (2007), *The Battle of the Labyrinth* (2008), and *The Last Olympian* (2009) (collectively, the "Percy Jackson Books").  (Compl. ¶ 1.)  Defendant Disney Book Group, LLC[1], a wholly owned subsidiary of defendant The Walt Disney Company (together, with Riordan, the "Disney defendants"), distributed the Percy Jackson Books.  (*Id.*; *see also* Def.'s Mem. of Law in Supp. of Mot. to Dismiss at 1; Pl.'s Mem. of Law in Opp. to the Riordan/Disney Defs.' Mot. to Dismiss at 1.)

Defendant Twentieth Century Fox Film Corporation, a wholly owned subsidiary of defendant Fox Entertainment Group, Inc., produced and distributed the motion picture, *Percy Jackson & The Olympians: The Lightning Thief* (2010) (the "Percy Jackson Film").  (Compl. ¶ 1.)  Defendant Dune Entertainment III LLC financed the Percy Jackson Film. (*Id.*)

B.  Summary of Plaintiffs' Books[2]

Plaintiffs' novels, written in the third person, chart the adventures of Percy John Allen (known as "PJ"), a modern-day teenager descended from the Greek mythological hero Perseus.

---

[1] The parties agree that plaintiffs erroneously named Disney/ABC International Television Company, Inc. as a defendant instead of Disney Book Group, LLC.  (*See* Pl.'s Mem. in Opp. to the Riordan/Disney Defs.' Mot. to Dismiss at 1 n.1.)  Disney Book Group, LLC is hereby substituted as a defendant in lieu of Disney/ABC International Television Company, Inc.

[2] The following summaries are based on the Court's review of plaintiffs' two books, the five Percy Jackson Books, and the Percy Jackson Film.  The contents of these works are essentially undisputed.  All other facts are taken from the public domain.  *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (permitting court to consider documents outside the pleadings on a Rule 12(b)(6) motion to dismiss where documents are integral to the pleading or subject to judicial notice); *Allen v. Scholastic Inc.*, 739 F. Supp. 2d 642, 655 (S.D.N.Y. 2011) (same).

PJ is summoned to fight ancient battles in order to save the world, all the while balancing the demands of school, sports, friends, love, and family back at home.

       *1.  The Hero Perseus*

In the first book, *The Hero Perseus*, seventeen-year-old PJ has just moved for his senior year of high school to Athenia, Georgia from New Jersey, where he left behind a girlfriend and an opportunity to start as quarterback on his school's football team.  PJ and his mother relocated after PJ's father, a firefighter, perished in the September 11 attacks.  No sooner does PJ arrive in Athenia than he receives a night-time visit from Hermes, the messenger of the Greek gods, who comes to life when PJ unintentionally sketches him with a paintbrush.  Hermes tells PJ a variety of incredible facts: the Greek gods are real, PJ is a remote descendent of the Greek hero Perseus, and the gods need PJ to intervene in the mythological world to prevent disaster.

Although skeptical at first, PJ realizes that the gods need him to recreate a lost moment in time—the moment when the hero Perseus, son of Zeus, slayed the evil Gorgon Medusa.  This moment is critical because it set in motion the delivery of thunderbolts to Zeus, and without his thunderbolts, Zeus cannot make rain.  PJ comes to learn that what happens in the mythological world has ramifications in the modern-day human world: specifically, a drought threatens Athenia, Georgia.

The story alternates between these two worlds, the mythological and the modern.  By night, PJ learns Greek mythology from Hermes and travels back in time to ancient Greece with Hermes as his guide.  By day, PJ embarks on his senior year of high school and adjusts to life in Athenia.

PJ's life revolves around sports and girls.  He joins his school's football team and vies for the starting quarterback position, which at first goes to his rival, Jake.  Jake happens to be dating

Jana, a blond cheerleader, who quickly becomes the object of PJ's romantic affection.  As PJ pursues Jana, he also develops a close friendship with another blond, Andi, the tomboy who lives next door.  Andi, however, may be interested in more than just friendship with PJ.  While PJ navigates these relationships during the day, at night he ventures into the world of ancient Greece.

Hermes—both tour guide and comic foil—leads PJ on his quest to slay Medusa.  Together they visit various figures and locations from the story of Perseus in Greek mythology.  They get wine from Dionysus to give to the Oracle of Delphi, who directs them to the Three Gray Ladies.  The Three Grey Ladies provide the location of the Stygian Nymphs, who have the special equipment PJ needs to behead Medusa.  On his way to the Nymphs, PJ battles the sea god Poseidon, the Giants of Arcadia, and the witch Circe.  PJ eventually reaches the Nymphs and obtains winged sandals and a leather bag to carry Medusa's head, but he must travel to the Underworld, via the River Styx, to get an invisibility helmet from Hades.

Along his journey, PJ receives help from the gods.  Zeus appears in the form of PJ's deceased father to provide comfort and inspiration.  Athena, the warrior goddess, gives PJ strategic advice, as well as some useful instruments.  She supplies him with a magic paintbrush, which transforms PJ's paintings into real objects, such as a boat and a sword.  Athena also offers him a mirrored shield for use against Medusa, who cannot be looked directly in the eye.

Armed with powerful tools, knowledge of Greek mythology, and growing courage, PJ confronts the evil Medusa.  He severs her head, as the hero Perseus did, and brings it to Zeus.  Yet while PJ restores his strength following this triumph, an epic battle looms between Zeus and the gods, on one side, and Cronus and the titans on the other.  Cronus, it turns out, was responsible for erasing the moment in time when the original Perseus killed Medusa.

With the fate of the world hanging in the balance, PJ rises to the occasion.  He defeats Cronus by exposing him to Medusa's head, turning him to stone.  Thanks to PJ's heroism, Zeus pushes over a frozen Cronus, breaking him into a thousand pieces, and regains control of the thunderbolts that make rain.

In the latter chapters, a clone plays PJ in the modern world while PJ remains in the mythological world.  But after defeating Cronus, PJ himself returns home to Athenia with a newfound sense of confidence and purpose, which he brings to bear on the athletic and romantic conflicts that had consumed his daily life.  PJ takes over as quarterback and leads his football team to victory in the last game of the season.  PJ also realizes—with some encouragement from the gods—that his true feelings lie with Andi, his dependable tomboy neighbor, and not with the fickle cheerleader Jana.  The book ends with PJ taking Andi to the homecoming dance and discovering that her full name is Andromeda—the wife of Perseus in Greek mythology.

## 2. *Atlas' Revenge*

In plaintiffs' second book, *Atlas' Revenge*, PJ has moved to Los Angeles for college.  He works part-time as an artist at a film studio, lives with a surfer named Julius, and dates a girl named Cate.  His busy life is interrupted by the unexpected return of two people he has not seen in years: Andi, his high-school girlfriend, whom he quite literally runs into on the street, and Hermes, the mythological messenger, who appears one night to inform PJ that the gods once again require his assistance.

This time the gods need PJ to perform the twelve tasks ("Labors") of the hero Hercules.  Hercules cannot complete the Labors himself because he has mysteriously wound up in the position of Atlas and must carry the heavens on his shoulders.  The burden on Hercules causes

earthquakes in Los Angeles and other natural disasters around the world.  Only PJ can avert further calamity.

Following Hermes' surprise visit, PJ encounters a beggar on the street who mutters a riddle about playing "twelve chances" and scoring "Lucky Seven."  The book then follows PJ on his quest to complete Hercules' twelve Labors and solve this riddle-cum-prophecy.  On PJ's side are the gods, who equip him for battle.  Out to defeat PJ are two Greek villains: Hecate, who schemes to restore the shattered titan Cronus to power, and Atlas, who seeks revenge for being doomed to carry the heavens by PJ's ancestor Perseus.

The mythological and modern worlds remain separate at first.  In the mythological world, PJ performs various Labors of Hercules: he slays the Nemean Lion, conquers the Lernaean Hydra, tames the Erymanthian Boar, and takes on the Amazons.  However, when he encounters the Cretan Bull on the streets of Los Angeles, his two worlds become intertwined.

It turns out that Cate—PJ's enchanting, yet capricious love interest—is actually the wicked witch Hecate.  PJ's roommate Julius ultimately reveals himself as the renegade Atlas.  Meanwhile, PJ discovers that both the prophetic beggar and his boss at the film studio personify Prometheus, his benefactor.  As PJ reconnects with his dynamic ex-girlfriend Andi—foil to the wicked Cate—Andi herself gets enmeshed in the mythological conflicts.

The climax occurs when PJ's recurring dream about snowboarding down a mountain known as Atlas' Revenge becomes a reality.  Using Zeus' breastplate as a snowboard, PJ masterfully descends the treacherous slope.  There he confronts Hecate and, with the last-minute help of his Prometheus, prevents Hecate from acquiring a precious ruby PJ had received from Hades—a ruby that Hecate needs to restart the heart of the evil Cronus who has been pieced back together.  With Hecate's plot foiled and Hercules' Labors' complete, PJ convinces Atlas to

6

release an imprisoned Andi and return to his post where the heavens rest on his shoulders, thereby restoring order to the universe.

In the denouement, PJ and Andi meet the gods, with Zeus again appearing as PJ's deceased father.  PJ learns that in performing Hercules' Labors, he has successfully displayed the seven virtues alluded to in the prophecy: fortitude, wisdom, humor, justice, charity, faith, and love.  PJ is also reminded of his family—namely his loving mother (and new stepfather), whom he had neglected during this hectic period in his life.  At the end of the book, as PJ and Andi head to the premier of the film PJ had finally completed at his day job, PJ gives Andi a ruby necklace, which Hades had furnished specially for the girl who stole PJ's heart.

C.  Summary of the Percy Jackson Books

The Disney defendants' five books tell the first-person story of Percy Jackson, an adolescent demigod whose father is Poseidon.  Percy and his fellow demigods battle creatures from Greek mythology on their adventures across modern-day America, with the ultimate objective to prevent the rise of the titan Kronos.

1.  *The Lightning Thief* [3]

*The Lightning Thief* begins with Percy as a hapless twelve-year-old who suffers from dyslexia and ADHD.  He lives with his mother and abusive, unseemly stepfather in a small Manhattan apartment.  His biological father has allegedly been lost at sea his entire life.  Because Percy cannot seem to stay out of trouble, each year he ends up in a different school.

Percy's troubles take on a new dimension when on a school field trip to the Metropolitan Museum of Art, a teacher pulls him aside and all of a sudden transforms into a winged monster, accusing him of an unspecified misdeed.  Percy fends her off with a magic pen that turns into a

---

[3] Because the complaint and the briefing devote considerably more attention to *The Lightning Thief* than to the other four Percy Jackson Books, this Court will do the same.

sword.  At first, no one acknowledges that this incident occurred.  But after Percy's mother finds out what happened, she rushes Percy and his only friend Grover—actually a half boy, half goat—to Camp Half-Blood.

Camp Half-Blood is a fortified training ground in the Long Island countryside for demigods such as Percy and Grover.  En route to the camp, a minotaur captures Percy's mother, but Percy and Grover narrowly escape into the safety of the campgrounds.  There Percy recovers from his injuries and meets the camp's inhabitants, including fellow camper Annabeth, the blond, athletic daughter of Athena; the counselor Luke, son of Hermes, who becomes Percy's personal trainer; and a teacher from Percy's school who is actually a centaur.

At Camp Half-Blood Percy learns that the gods of Greek mythology are real and present in the modern-day United States.  Indeed, Mt. Olympus follows the path of western civilization and is currently located on the 600th floor of the Empire State Building.  Percy further discovers his father is Poseidon, god of the sea.  As a result of this divine parentage, Percy can use water in ways that ordinary humans cannot.  His dyslexia makes him proficient in ancient Greek and his ADHD hones his battle instincts.

It turns out that the reason Percy has recently come under attack by monsters—and the reason the world has recently experienced stormy weather—is a fight brewing among the gods.  Zeus believes that Percy and his father, Poseidon, have stolen Zeus' lightning bolt.  Percy must go on a quest to resolve this conflict.  The Oracle directs Percy to go west, find what was stolen, and return it within ten days—yet, at the same time, to beware of betrayal by a friend and the failure to save what supposedly matters most.

Percy, his comic sidekick Grover, and the valiant Athena embark on a cross-country journey to the Underworld, located beneath Los Angeles, in order to retrieve the lightning bolt

and free Percy's captive mother.  The young demigods face many challenges along the way.  For example, when looking for a bite to eat off the highway in New Jersey, they end up in the evil Medusa's "gnome emporium," a store full of her petrified victims.  Percy heroically slays Medusa with his pen-turned-sword.  The group also gets detained in Las Vegas at the Lotus Hotel and Casino, where the intoxicating air causes them to lose all sense of time.  With the clock running down, Percy frees his cohort from their trance and leads them to the Underworld.  Meanwhile, the demigods' escapades capture the attention of the national news media, which— oblivious to divine interventions and also incited by Percy's nasty stepfather—portray Percy as a dangerous fugitive.

In the Underworld Percy encounters the god Hades and his own mother.  When Hades blames Percy for stealing the lightning bolt, Percy realizes that he has been framed: he was unwittingly carrying the missing lightning in his backpack all along.  Although Percy fails to rescue his mother, he manages to escape from the Underworld with the bolt in hand.

Following a battle against the gods Ares and Aphrodite, Percy flies to Mt. Olympus.  There, atop the Empire State Building, he returns the lightning bolt to Zeus and finally meets his father Poseidon.  Percy tries to explain that he has learned that the evil titan Kronos—whom Zeus had cut into a thousand pieces ages ago—is regaining strength, but the gods do not want to discuss it.  In a father-son moment, Poseidon expresses his love for Percy's mother, his pride in Percy, and his regret that Percy was born with a hero's tragic fate.  Percy subsequently goes back to New York City and greets his mother, who, miraculously, had returned home from the Underworld.  Thanks to some help from the gods, Percy's stepfather is turned to stone by Medusa's head.

In the closing chapter, Percy returns to Camp Half-Blood.  He discovers that it was his counselor and friend Luke who had joined Kronos against the gods and stolen Zeus' lightning bolt, but Luke gets away before Percy can take action.  Percy thus decides that he will have to go back to Camp Half-Blood the following summer to hunt down Luke.

### 2.   *The Sea of Monsters*

In *The Sea of Monsters*, Percy, now thirteen, returns to Camp Half-Blood only to find the camp's fortified borders weakened because a special tree has been poisoned.  His friend Grover has also gone missing.  To rescue Grover and obtain a golden fleece that will save the camp, Percy follows another camper on a quest across the Sea of Monsters—known to humans as the Bermuda Triangle.  Accompanying Percy are his friend Annabeth and fellow camper Tyson, who Percy discovers is actually his half-brother.  Percy continues to confront mythological creatures such as the Gray Sisters, the Hydra, Sirens, Circe, and the Cyclops.  He also battles Luke, his nemesis, who is gathering an army and warning that a cut-up Kronos is re-forming. Ultimately, Percy escapes from Luke and returns to Camp Half-Blood with the golden fleece. Although the golden fleece saves the special tree at the camp's borders, it also brings back to life a girl named Thalia—which the campers interpret as part of Kronos' plot.

### 3.   *The Titan's Curse*

In *The Titan's Curse*, a fourteen-year-old Percy is attending yet another school.  After learning that Camp Half-Blood needs more campers, Percy and his friends try to rescue two new demigods from a monster.  During the ensuing melee, Annabeth vanishes.  Artemis, goddess of the hunt, disappears as well.  The demigods' thus begin a quest to save Artemis and Annabeth before the winter solstice.  On another cross-country journey—this time through Washington, D.C., the Southwest, and northern California—Percy meets such mythological creatures as the

Nemean Lion and Erymanthian Boar.  In San Francisco, Percy faces his nemesis Luke, who has forced Annabeth and Artemis—in place of Atlas—to carry the burden of the sky ("the titan's curse") so that Atlas can freely recruit soldiers for the evil Kronos' army.  In a climactic battle scene, Percy and Artemis manage to transfer the burden of the sky back to Atlas, and the demigod Thalia vanquishes Luke—at least for the time being.  Romantic subplots begin to develop in this book as Aphrodite, the goddess of love, foreshadows Percy's attraction to Annabeth, and Percy's mother acquires a new boyfriend.  In addition, Percy becomes closer to his father as Poseidon defends Percy and his friends against gods who are concerned that the demigods might—according to the so-called Great Prophecy—be destined to destroy Olympus.

### 4.   *The Battle of the Labyrinth*

Following an attack at his new school, fifteen-year-old Percy again returns to Camp Half-Blood, where he discovers that Luke is preparing to infiltrate the camp through an underground Labyrinth built by Daedalus.  The demigods' quest is thus to enter the Labyrinth, find Daedalus, and prevent an invasion by Luke and Kronos, whose supporters are piecing him back together, bit-by-bit, in a golden coffin on Luke's cruise ship.  Annabeth, an architecture buff, leads the demigods through the underground maze.  Percy also ventures to locations such as Alcatraz, Calypso's island, and Mt. St. Helens (where the romantic tension between Percy and Annabeth heightens).  When Percy comes upon Kronos' coffin, he finds that Kronos has taken over Luke's body—a body that looks dead but is stirring back to life.  The demigods ultimately stave off an invasion of camp, and Daedalus sacrifices himself so that the campers' enemies can no longer use the Labyrinth against them.  At the end of the book, Percy's father, Poseidon, makes a surprise visit to Percy's fifteenth birthday party in Manhattan.  The Great Prophecy—and Percy's role in it—remain a mystery.

5.   *The Last Olympian*

In *The Last Olympian*, Percy is about to turn sixteen, and the demigods must unravel the Great Prophecy.  This prophecy speaks of a half-blood reaching "sixteen against all odds" and a hero making a "single choice" that will "end his days" and determine the future of Olympus. When Kronos' army invades New York City, an epic battle ensues between the Greek gods and titans, with Percy and his fellow demigods playing pivotal roles.  In the heat of battle, Annabeth convinces Luke to turn on his evil master Kronos.  By sacrificing himself, Luke is able to defeat Kronos and fulfill the Great Prophecy.  Olympus—and western civilization—is saved.  In recognition of Percy's heroism throughout the war, Poseidon offers Percy immortality, which Percy declines.  Percy instead asks for a promise that the gods will take better care of their demigod children who are always vulnerable to attack.  Percy finally declares his love for Annabeth, and they become a happy couple.

D.   Summary of the Percy Jackson Film

The Percy Jackson Film tells roughly the same story as the first Percy Jackson Book, *The Lightning Thief*.  The fast-paced action film opens, however, with a meeting between Zeus and Poseidon on top of the Empire State Building in modern-day New York City.  Zeus accuses Poseidon of having his son, Percy Jackson, steal Zeus's master bolt.  Zeus can no longer make thunder and he threatens war if the bolt is not returned within fourteen days.

As in the book, Percy fends off a teacher who morphs into a winged monster and accuses him of stealing Zeus' lightning bolt.  Percy's mother and friend Grover then whisk him away to Camp Half-Blood, with a minotaur capturing the mother en route.  At Camp Half-Blood Percy discovers that he is the son of Poseidon and meets other campers, such as Annabeth and Luke.

Unlike in the first Percy Jackson Book, however, Hades appears one evening to offer Percy a deal: his mother in exchange for the missing lightning bolt.

Determined to rescue his mother, Percy leaves Camp Half-Blood and embarks with Grover and Annabeth on a journey to collect the three pearls he needs to gain entrance to the Underworld.  First, he slays Medusa at her stone statue shop in New Jersey and gets hold of pearl number one.  Percy and his fellow demigods next travel to a replica of the Parthenon in Nashville, where Percy uses Medusa's head as a weapon to defeat a multi-headed Hydra and take the second pearl.  The group then goes to Las Vegas, where Percy manages to break the others out of a lotus-induced trance, secure the third pearl, and lead them to their destination—the Underworld—just in the nick of time.

With the three pearls in hand, Percy reaches the Underworld, located beneath Hollywood, in order to free his mother from Hades.  There, Percy discovers that his fellow camper Luke had hidden the missing lightning bolt in the shield that Luke had given Percy.  Luke—not Percy, as Zeus had suspected—is the lightning thief determined to take down Olympus.  Percy manages to rescue his mother and leaves with the bolt to return to Olympus.

On his way to Olympus, however, a battle ensues between Luke and Percy in the sky above the streets of Manhattan.  Fighting with water, an emboldened Percy—son of the sea god—defeats Luke and successfully brings the thunderbolt back to Olympus immediately before Zeus' deadline passes.  At Olympus, above the Empire State Building, Percy meets his heretofore absent father, Poseidon, who explains that although Zeus had forced him to leave Percy and Percy's mother, he would continue to protect Percy.

At the end of the Film, Percy returns to Camp Half-Blood and the evil stepfather walks into a trap set by Percy, falling prey to the deadly glare of Medusa's eyes.

E.  This Action

Plaintiffs contend that the Percy Jackson Books and the Percy Jackson Film infringe their copyrights in *The Hero Perseus* and *Atlas' Revenge*.  In support of their claim, plaintiffs allege numerous similarities between their works and defendants'.  Plaintiffs seek both monetary damages and a preliminary injunction pursuant to the Copyright Act, 17 U.S.C. §§ 501-05.

The Disney defendants have now moved to dismiss the claims against them on the basis that the Percy Jackson Books are not substantially similar to plaintiffs' books.  Defendants Twentieth Century Fox, Fox Entertainment, and Dune Entertainment have separately moved to dismiss the claims against them on the basis that the Percy Jackson Film is not substantially similar to plaintiffs' books.

II.  **DISCUSSION**

A.  Rule 12(b)(6) Standard

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006).  A complaint should be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556).  On a Rule 12(b)(6) motion documents outside the complaint may be considered if they are integral to the pleading or subject to judicial notice. *See Global Network*

14

*Commc'ns*, 458 F.3d at 153.  In a copyright action, "the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings."  *Peter F. Gaito Architecture, LLC v. Simone Development Corp.,* 602 F.3d 57, 64 (2d Cir. 2010) (internal citations omitted).

     B.  <u>Substantial Similarity</u>

     To establish a claim of copyright infringement, "a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiffs' work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's."  *Id.* at 63 (quotation marks and citation omitted).  Because defendants seek to dismiss plaintiffs' copyright claims based on a lack of substantial similarity, the Court will for purposes of these motions assume that actual copying has occurred and therefore focus on the issue of substantial similarity.

     In the Second Circuit, the "standard test for substantial similarity between two items is whether an 'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'"  *Id.* at 66 (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001) (quoting *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 100 (2d Cir. 1999))).  This so-called "ordinary observer" test asks whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work."  *Peter F. Gaito*, F.3d at 66 (quoting *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995)).  Where, as here, the works at issue contain both protectible and nonprotectible elements, the analysis should be "more discerning"—that is, the court should "attempt to extract the unprotectible elements from [its] consideration and ask whether the protectible elements, standing alone, are substantially similar."  *Peter F. Gaito*, F.3d at 66

(quoting *Knitwaves, Inc.*, 71 F.3d at 1002).  Substantial similarity exists when "protected expression in the earlier work [] was copied and [] the amount that was copied is more than de minimis.'"  *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003) (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137-38 (2d Cir. 1998)).

It is well-established that copyright does not protect an idea, but only its expression.  *See* 17 U.S.C. § 102(b); *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90-91 (2d Cir. 1976).  "While the demarcation between idea and expression may not be susceptible to overly helpful generalization, it has been emphasized repeatedly that the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization."  *Id.* at 91.  Stock themes, stock characters, and "'scenes a faire,' that is scenes that necessarily result from the choice of a setting or situation," do not enjoy copyright protection.  *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986); *see also Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 1999).

The Second Circuit has cautioned, however, that courts should not merely "dissect" the works at issue "into separate components and compare only those elements which are in themselves copyrightable."  *Peter F. Gaito*, 602 F.3d at 66.  Instead, courts' principal task is to compare the works' "total concept and overall feel . . . as instructed by [] good eyes and common sense."  *Id.* (internal citations omitted); *see also Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir. 1996).  "Thus, in the end, [the] inquiry necessarily focuses on whether the alleged infringer has misappropriated "the original way in which the author has 'selected, coordinated, and arranged' the elements of his or her work."  *Peter F. Gaito*, 602 F.3d at 66 (internal citation omitted).

Although the question of substantial similarity often must be resolved by a jury, a district court may "resolve that question as a matter of law, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Id.* at 64 (quoting *Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 240 (2d Cir. 1983)).   Where, as here, the works are integral to the complaint, "it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation." *Id.* (affirming district court's grant of motion to dismiss in copyright action involving architectural works); *see also Allen v. Scholastic Inc.*, 739 F. Supp. 2d 642 (S.D.N.Y. 2011) (granting motion to dismiss in copyright action involving literary works); *Canal+ Image UK v. Lutvank*, 773 F. Supp. 2d 419 (S.D.N.Y.  2011) (granting motion to dismiss in copyright action involving film and musical adaptation of the film).   "The well-established general rule in this circuit has been to limit the use of expert opinion in determining whether works at issue are substantially similar." *Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 713 (2d Cir. 1992).

Accordingly, the Court compares plaintiffs' works first to the Percy Jackson Books and then to the Percy Jackson Film.  As instructed by the Second Circuit, the Court examines similarities between the works' protectible elements and their total concept and overall feel.

1.    *Comparison of Plaintiffs' Books and the Percy Jackson Books*

In an analysis of literary works for substantial similarity, courts often consider such aspects as narrative structure, characters, themes, setting, plots and scenes, as well as total concept and overall feel.  *See, e.g.*, *Williams*, 84 F.3d at 589; *Allen*, 739 F. Supp. 2d at 655;

*Porto v. Guirgis*, 659 F. Supp. 2d 597, 614 (S.D.N.Y. 2009).  The court will address each aspect in turn.

> a.   Narrative Structure

To begin with, there are significant structural differences in how the young heroes' adventure stories are told.  Plaintiffs' books are narrated in the third person.  By contrast, the Percy Jackson Books are narrated in the first person by Percy himself.  Plaintiffs' books cover two distinct periods in PJ's life: the fall of his senior year of high school and a sliver of his college experience four years later.  By contrast, the Percy Jackson Books follow Percy from age twelve to sixteen, with each consecutive book set in a consecutive year of Percy's life.

Moreover, the two sets of works treat the interruptions of the protagonists' quotidian lives in a different fashion.  In plaintiffs' books, PJ by and large maintains his everyday identity, while at night he travels to a mythological world in order to wage battles.  The stories flip back and forth between PJ's two separate worlds; only deep into *Atlas' Revenge* do those two worlds overlap.  In the Percy Jackson Books, on the other hand, Percy attends a new school each academic year and then leaves the school for Camp Half-Blood and an ensuing quest.  Percy's story does not switch between separate worlds: throughout the five books, Percy remains in the modern-day United States, where the gods also live, and he retains his demigod status.

Furthermore, the two sets of works take different approaches to edifying the protagonists—and readers—about Greek mythology.  Plaintiffs' books rely heavily on straight exposition from the messenger Hermes, who serves as PJ's tour guide and sidekick.  By contrast, Percy Jackson learns about Greek mythology mainly through conversations with various characters at Camp Half-Blood, which itself serves as an orientation center for Greek mythology.  "While the differences between the works are not dispositive, 'numerous differences tend to

undercut substantial similarity.'"  *Porto*, 659 F. Supp. at 614 (citing *Warner Bros.*, 720 F.2d at 241).

> b.  Characters

According to plaintiffs, the characters in the two sets of works are a major point of similarity.  Plaintiffs contend that Percy, Annabeth, Grover, and various mythological figures in the Percy Jackson Books are substantially similar to PJ, Andi, Hermes, and various mythological figures in their own books.  To determine whether characters are similar as a matter of law, courts look at the "totality of [the characters'] attributes and traits as well as the extent to which the defendants' characters capture the total concept and feel of figures in the plaintiffs work."  *Hogan*, 48 F. Supp. 2d at 309-10 (quotation marks and citations omitted).  "The bar for substantial similarity in a character is set quite high."  *Sheldon Abend Revocable Trust v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010) (no substantial similarity between two single male protagonists confined to their homes who spy on neighbors to stave off boredom); *see Hogan*, 48 F. Supp. 2d at 309–10 (no substantial similarity between two young male half-vampire characters named Nicholas Gaunt who both had similar appearances, both experienced flashbacks as part of a quest to discover their origins, and both became killers); *Arden v. Columbia Pictures Industries, Inc.,* 908 F.Supp. 1248, 1261 (S.D.N.Y. 1995) (no substantial similarity between two thirty-something self-centered bachelors who pursue love interests and become trapped in a repeating day).

To be sure, there are similarities between the PJ and Percy characters.  However, these similarities are not copyrightable.  "As have stories since time immemorial, both [sets of works] involve a questing hero acting in accord with a divine power or powers."  *Bisson-Dath v. Sony Computer Entm't Am., Inc.*, 694 F. Supp. 2d 1071, 1082 (N.D. Cal. 2010).  Young male heroes

who must cope with missing parents and display their strength in battles with otherworldly forces are commonplace.  Harry Potter and Spiderman, for example, both fit this mold.  In addition, the shared name Percy[4] derives from the hero Perseus of Greek mythology, a character unquestionably in the public domain.

Despite these nonprotectible similarities, the two protagonists are portrayed quite differently.  PJ is a remote descendant of the hero Perseus born to two human parents.  By contrast, Percy is the son of the sea god Poseidon and a mortal mother; he is a demigod.  PJ is seventeen in the first book and twenty-one in the second.  By contrast, Percy is twelve in the first book and sixteen in the last book.  PJ is cool, athletic, and popular with girls at school.  By contrast, Percy is learning-disabled, accident prone, and sarcastic; he has few friends at school and connects only with his peers at Camp Half-Blood.  The total concept and overall feel of the protagonists differs considerably.

Predictably, the two sets of works also feature stock characters, such as a sidekick and a love interest for their young heroes.  These stock characters are not copyrightable: heroes frequently have sidekicks, and teenage boys frequently pursue girls of the blond, popular, and athletic variety.   In any event, these sidekicks and love interests bear scant resemblance to their counterparts.

PJ's sidekick Hermes and Percy's sidekick Grover are markedly different.  Hermes—the messenger god from Greek mythology—visits PJ at night and guides him into the mythological world of ancient Greece.  Grover—half-human, half-goat—attends school with Percy and accompanies him on journeys across the United States.[5]

---

[4] PJ stands for Percy John.

[5] The messenger god Hermes makes an appearance in the Percy Jackson Books too; but unlike plaintiffs' Hermes, the Disney defendants' Hermes plays only a minor role.

Plaintiffs also draw a comparison between the ultimate love interests, PJ's Andi and Percy's Annabeth—two blond females who like to watch baseball and tease the protagonist.  Yet the differences between these characters overshadow their similarities.  In *The Hero Perseus*, Andi is a tomboy who lives in the house next-door to PJ.[6]  In *Atlas' Revenge*, Andi is a college student and entrepreneur.  Andi is related to the mythological figure Andromeda, but at no point does she display special powers or fight mythological creatures herself.  On the other hand, Annabeth is a demigod, the daughter of Athena.  She meets Percy at Camp Half-Blood, accompanies him on virtually all his journeys, and valiantly battles evil forces herself.[7]

Other stock characters in the two sets of works bear even less resemblance to each other. PJ's benign stepfather is radically different from Percy's noxious stepfather.  Jake—PJ's rival for girls and the starting quarterback spot—is quite dissimilar to Luke, the demigod pawn of Kronos.[8]  The list can go on.

In addition, plaintiffs focus on similarities among the characters from Greek mythology who appear in both sets of books.  Needless to say, figures from Greek mythology are not copyrightable.  *See Bisson-Dath*, 694 F. Supp. 2d at 1088 (Greek gods are "stock figures not only of many contemporary stories . . . but also of the Western collective unconscious.")  That the two sets of works both feature Zeus, Athena, Hades, Kronos, Medusa, Atlas and others is an obvious consequence of basing a book on Greek mythology.  And although both sets of

---

[6] Andi's character-type—the loyal tomboy in competition with a cheerleader for the affection of a high-school heartthrob—is a recurring one in popular culture.  *See, e.g.*, Taylor Swift, You Belong With Me (Big Machine 2008) ("But she wears short skirts / I wear t-shirts / She's cheer captain / And I'm on the bleachers / Dreaming about the day / When you wake up and find  / What you're looking for / Has been here the whole time").  No such love triangle exists in the Percy Jackson Books.

[7] Plaintiffs also liken Annabeth—the daughter of Athena—to the Athena character in their own books.  This is a stretch.  Not only does Athena herself appear in the Percy Jackson Books, but plaintiffs' Athena plays an entirely different role from Annabeth.

[8] Although plaintiffs and Disney defendants' spell this character's name differently, there is no question that he is the same character from Greek mythology.  For simplicity's sake, the Court will just use one spelling here.

mythological figures speak in modern language, only those in the Percy Jackson Books actually live in modern-day America and use recognizable consumer products.  Consequently, the overall feel of these mythological characters varies.

    c.   Themes

Plaintiffs' allege that the themes in the two sets of works are substantially similar. However, the general themes plaintiffs identify are not copyrightable.  *See Reyher*, 533 F.2d at 91.  The development of an adolescent into a man through a series of tests surely is not entitled to copyright protection.  Nor are the associated themes of bravery and independence and facing down one's enemies.  As discussed, PJ and Percy are also not unique within their genre for lacking fathers; at any rate, the treatment of this theme differs:  PJ idealizes his father, Zack, who died tragically when PJ was a teenager, and PJ thus emulates him.  Percy, on the other hand, has a conflicted relationship with his father Poseidon, god of the sea, who abandoned Percy as a baby.

Another shared theme is how mythology affects the real world.  Both books explain certain current events through the actions of the gods.  For instance, while the absence of Zeus' lightning bolt causes a draught in plaintiffs' books, the rivalries among the gods for Zeus' lightning bolt causes stormy skies and oceans in the Percy Jackson Books.  This conceit is as old as mythology itself.  It is not copyrightable.

Furthermore, the two sets of books differ in other central themes.  Unlike the Percy Jackson Books, plaintiffs' books deal with teenage angst over dating and sports.  And unlike plaintiffs' books, the Percy Jackson Books address insecurities regarding learning disabilities and domestic strife.

    d.   Setting

Both sets of works take place in present times and enter the realm of Greek mythology. The similarities in setting end there. *The Hero Perseus* is set in the small town of Athenia, Georgia, where PJ moved for his senior year of high school, and *Atlas' Revenge* is set in Los Angeles, where PJ attends college. By contrast, the Percy Jackson Books are set all over the country. Percy's home is Manhattan, each year he goes to Camp Half-Blood on Long Island, and his adventures span the continental United States (plus the Bermuda Triangle).

The depictions of locations from Greek mythology also differ. The Percy Jackson Books embed the mythological realm in modern-day America; Mt. Olympus is on floor 600 of the Empire State Building and Hades is underneath Los Angeles. Plaintiffs' books, however, situate these locations in a far-off time and place, which, for the most part, remains separate from the modern world. Accordingly, the settings of the two sets of works are not substantially similar.

e.   Plot and Scenes

At a generalized level, plaintiffs' books and the Percy Jackson Books both tell the story of modern-day young heroes who must prevent destruction of the world by forces from Greek mythology. This basic plot idea is clearly not protectible. At a more particularized level, the two sets of works also share some plot elements and scenes. These similarities are almost all nonprotectible. Meanwhile, the expression of the few comparable storylines that could be considered tweaks on Greek mythology differs.

Plaintiffs list plot elements and scenes that their books have in common with the Disney defendants'. Many of these similarities—such as sports contests, struggles with homework, classroom scenes, snowboarding scenes, kissing scenes, New York Yankees references—are scenes a faire in books about adolescent males. Other similarities—such as the use of magic weapons—are scenes a faire in fantasy adventure stories. As such, these similarities are

nonprotectible.  *See Walker*, 784 F.2d at 50 (finding that "elements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about the work of policemen in the South Bronx").  By the same token, conflicts with Kronos, Atlas, and Medusa are scenes a faire in stories based on Greek mythology, as are Hercules' Labors.  *See Bissoon-Dath*, 694 F. Supp. 2d at 1088 ("Greek gods, dialogues among them about mortal affairs, rivalries among the gods, and mythical beasts such as the Hydra or the Nemean Lion are unprotectable elements; it is uncontroversial that they have been used widely in both ancient and modern artistic works . . . .").

Plaintiffs point out that their first book, *The Hero Perseus*, and the first Percy Jackson Book, *The Lightning Thief*, both revolve around a quest to get Zeus his lightning bolt.  The particular expression of this general plot idea differs dramatically, however.   In *The Hero Perseus*, PJ's mission is to go back in time to re-create a moment that has been erased—the critical moment when Perseus slayed Medusa and set in motion the chain of events that delivered Zeus his bolt so that he could make rain.  In *The Lightning Thief*, by contrast, Percy's mission is to venture across the modern-day United States in order to find the bolt that Zeus' rivals have literally stolen.  An ordinary observer would not regard the storyline involving Zeus' bolt as the same.

Plaintiffs also draw similarities between the expression of the protagonists' conflicts with Atlas and Kronos, two titans whom Greek mythology cast as overthrown rivals to the gods.  In both sets of books, Atlas transfers the heavens to other characters and thus creates an imperative to shift the burden back to its rightful bearer.  Although the originality of this storyline is highly debatable, regardless of whether it is original or not, its particular expression varies considerably

in the two sets of works.[9]  The two sets of works feature different characters standing in for Atlas, with different consequences.  Atlas' machinations in plaintiffs' second book encumbers the hero Hercules, who cannot complete his Labors.  PJ's re-creation of Hercules' twelve Labors becomes the organizing principle for the book.  In the third Percy Jackson Book, by contrast, Atlas forces the god Artemis and demigod Annabeth to shoulder his burden while he recruits soldiers for Kronos' army.  Although Percy does perform some of Hercules' Labors, these Labors are spread across the whole series in a different order and they are a side show to the main quest of each book.

Indeed, both sets of works also feature a defeated Kronos who gradually—and quite literally—pieces back together in order to regain control of the world.  Although this plot device does not appear in Greek mythology, the method of Kronos' destruction and reconstruction varies between the two sets of works.  In plaintiffs' books, PJ uses Medusa's head to turn Kronos to stone and Zeus then shatters his petrified nemesis.  To bring him back to life, the evil Hecate gathers the stone pieces, one by one.  On the other hand, in the Percy Jackson Books Kronos is in pieces because Zeus had scythed him thousands of years ago.  Each time a supporter joins Kronos' army, a piece of Kronos reappears in his coffin on a cruise ship.  This variation severely undercuts a finding of substantial similarity.  *See Sheldon Abend*, 748 F. Supp. 2d. at 205 ("[I]n considering the question of substantial similarity, an analysis of both the similarities and the differences is appropriate.").

The existence of a protectible similarity—assuming that Kronos' piece-by-piece resurrection is protectible—does not in and of itself establish substantial similarity between works.  *See Tufenkian Import/Export Ventures*, 338 F.3d at 131 (Substantial similarity exists

---

[9] As set forth above, on a motion to dismiss the Court considers only the works themselves and facts taken from the public domain, such as Greek mythology.  The Court does not consider other works where Atlas transfers the world to the shoulders of others.

where "the amount [of protected expression] that was copied is 'more than de minimis.'" (internal citation omitted)); *cf. Allen*, 739 F. Supp. 2d at 663 ("[R]andom similarities scattered throughout the works . . . cannot [by themselves] support a finding of substantial similarity." (citing *Williams*, 84 F.3d at 590)).  The underlying issue remains whether the works as a whole are substantially similar.  *Williams*, 84 F.3d at 590.

### f.   Total Concept and Overall Feel

The Court's substantial similarity analysis is "principally guided" by the "total concept and overall feel" of the works."  *Peter F. Gaito*, 602 F.3d at 66.  Although both sets of young-adult fantasy adventure stories rest on a similar premise—that Greek mythology is real and young modern-day protagonists must fight mythological battles in order to save the world—the total concept and overall feel of the two sets of books is distinct.[10]

Plaintiffs' books are not just about adventures through Greek mythology; they are also about the everyday life of a conventional high school and college student who must juggle friends, family, romance, sports, and academics.  The Percy Jackson Books, on the other hand, follow the life of an adolescent misfit thrust into the interminable role of a demigod who must survive among gods and monsters in the modern-day United States.  Unlike PJ, whom plaintiffs describe as "teenager by day, mythological hero by night," Percy does not lead dual lives.

Differences in tone and mood also contribute to distinctive overall feels.  While both sets of work use humor, plaintiffs' books are jokey, whereas the Percy Jackson Books are irreverent. The mood of the Percy Jackson Books, meanwhile, is much darker than that of plaintiffs' books.

---

[10] As the Second Circuit stated in *Williams v. Crichton*, "[c]onsideration of the total concept and feel of a work, rather than specific inquiry into plot and character development, is especially appropriate in an infringement action involving children's works, because children's works are often less complex than those aimed at an adult audience.". 84 F.3d at 589; *see also Allen*, 739 F. Supp. 2d at 656-57 (emphasizing total concept and feel in comparison of the plaintiffs' books to a Harry Potter book) .  The Court bears this caveat in mind as it compares two sets of works that are presumably aimed at adolescent, rather than adult, audiences.

The way that the two sets of books end typifies this difference in feel. Plaintiffs' books each conclude on a feel-good note, with PJ safely returned to his normal life after the successful completion of his mission. The Percy Jackson Books, however, each finish with a sense of foreboding, and the demigods are never quite secure.

Because the similarities between the two sets of works overwhelmingly relate to nonprotectible elements, and the similarities in their expression are greatly outweighed by their differences, this Court concludes that no reasonable jury could find the works substantially similar.

      2.     *Comparison of Plaintiffs' Books and the Percy Jackson Film*

The Court now turns to the Percy Jackson Film, *The Lightning Thief*. A comparison of the protectible elements and the total look and overall feel of plaintiffs' books, on the one hand, with the Film, on the other, reveals that they are not substantially similar as a matter of law. Much of the Court's analysis of *The Lightning Thief* book applies to the *The Lightning Thief* film. Indeed, the variation between the first Percy Jackson Book and the Film makes the Film even less similar to plaintiffs' works.

The opening scene in the Percy Jackson Film illustrates the differences in characters, plot, setting, and overall feel. The Film begins on a dark, stormy night in New York City, where Poseidon emerges from the river, walks down the street dressed like a typical urban male, and meets a similarly dressed Zeus atop the Empire State Building. There, Zeus accuses Poseidon's son of stealing his lightning bolt. The scene thus sets up a rivalry among Olympic gods who live in the present.

Although plaintiffs' books and the Film both feature a contemporary teenage hero named after Perseus who fights battles from Greek mythology, the protagonists are not substantially

similar.  The Film's Percy differs from PJ in virtually all the same ways as the Books' Percy and furthermore displays a distinctive edgy side that the conventional PJ lacks.

While PJ and Percy must both navigate the world of Greek mythology in order to solve the mystery of Zeus' missing lightning bolt, the plots of *The Hero Perseus* and the Percy Jackson Film develop in very different ways.  In *The Hero Perseus*, a worsening drought convinces PJ that he needs to re-create a critical moment in time—which had been erased—so that Zeus can take delivery of his bolt and make rain.  By contrast, Percy Jackson embarks on a cross-country journey with his peers, Grover and Annabeth, to prove that he is not the suspected lightning thief and to rescue his captive mother.  It is Percy's desire to save his mother that motivates his quest.  PJ's mother does not play even a remotely similar role in *The Hero Perseus*.

The villains also differ.  Kronos, the arch enemy in plaintiffs' works, does not appear in the Percy Jackson Film.  Rather, Percy's nemesis is Luke, a fellow demigod who masquerades as Percy's friend but who is actually in league with Hades, god of the Underworld.  *The Hero Perseus* culminates with an epic clash between the titans and the gods, whereas the Percy Jackson Film culminates with a battle between Percy and Luke—two teenage demigods—above the streets of Manhattan.

Indeed, the entire Percy Jackson Film takes place in the United States in the present day.  Percy travels from New York to New Jersey to Nashville to Las Vegas to Los Angeles and then back to New York.  Popular culture references pervade the Film, creating a markedly current feel.  The setting thus marks a major point of departure from plaintiffs' *The Hero Perseus*, which alternates between the fictional rural town of Athenia, Georgia and a far off mythological world.

Like the Percy Jackson Books, the Film contains a number of similar scenes a faire to plaintiffs' works.  Those scenes a faire from Greek mythology—such as the defeat of Medusa,

the defeat of the Hydra, the use of flying shoes, conversations among the gods—and from teen

fiction—such as sports contests, school classrooms, flirtation between boys and girls—are

simply nonprotectible. *See Walker*, 784 F.2d at 50. Moreover, the general themes shared by

plaintiffs' books and the Film exist in countless other works created over the centuries.

Because the similarities between plaintiffs' books and the Percy Jackson Film relate

essentially to nonprotectible elements, and the similarities in the works' expression are greatly

outweighed by their differences, this Court concludes that no reasonable jury could find the

works substantially similar.

## III.   CONCLUSION

Because the Percy Jackson Books are not substantially similar to plaintiffs' books as a

matter of law, the Disney defendants' motion to dismiss the complaint is granted. Because the

Percy Jackson Film also is not substantially similar to plaintiffs' books as a matter of law, the

remaining defendants' motion to dismiss the complaint is granted.


Dated: New York, New York
       September 20, 2011


SO ORDERED:

Sidney H. Stein, U.S.D.J.